UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

RUSSELL    DUSEK,    MARSHA
PESHKIN, DAVID ABEL, CAROL
DIFAZIO, as TIC, BEN HELLER,
WARREN   M.   HELLER,   NORMA
HILL, JABA ASSOCIATES, CAROL
KAMENSTEIN,            DAVID
KAMENSTEIN,            PETER
KAMENSTEIN,            TRACY
KAMENSTEIN,         PEERSTATE
EQUITY   FUND,   LP,   ROBERT
GETZ,   RAR   ENTREPRENEURIAL
FUND, LTD., JUDITH RECHLER,
SAGE    ASSOCIATES,   JEFFREY
SHANKMAN,   LORI   SIROTKIN,
STONY    BROOK    FOUNDATION,
YESOD TRUST, MELVIN H. AND
LEONA  GALE  JOINT  REVOCABLE
LIVING TRUST, FREDERICK AND
SUSAN    KONIGSBERG   JTWROS,
EDYNE GORDON AS EXECUTRIX OF
THE ESTATE OF ALLEN GORDON,
JOEL BUSEL REVOCABLE TRUST,
SANDRA    BUSEL    REVOCABLE
TRUST, ROBERT YAFFE, PALMER
FAMILY TRUST, MARTIN LIFTON,
MARLENE    KRAUSS,    SLOAN
KAMENSTEIN,           SYLVAN
ASSOCIATES          LIMITED
PARTNERSHIP,   JOAN   ROMAN,
WILENITZ TRUST U/ART FOURTH
O/W/O    ISRAEL    WILENITZ,
ROBERT    ROMAN,    JEROME
GOODMAN,   FRANK  &   CAROL
DIFAZIO    AS   TIC,   EUGENE
KISSINGER    TRUST    U/A/D
12/6/99,  NANCY  DVER-COHEN
REV TST DTD 11/20/00, NANCY
DVER-COHEN   AND  RALPH  H.
COHEN TSTEES, and DONALD A.
BENJAMIN,

        Plaintiffs,

v.                                    Case No: 2:14-cv-184-FtM-29CM

JPMORGAN    CHASE    &    CO.,
JPMORGAN  CHASE  BANK  N.A.,
J.P. MORGAN SECURITIES LLC,
J.P.    MORGAN    SECURITIES,
LTD.,    JOHN    HOGAN,    and
RICHARD CASSA,

        Defendants.

_____

### OPINION AND ORDER

        This matter comes before the Court on review of defendants'
Motion to Dismiss the Second Amended Complaint (Doc. #55) filed on
October  17,  2014.  Plaintiffs  filed  a  Memorandum  of  Law  in
Opposition (Doc. #57) on November 26, 2014.  Defendants filed a
Reply  (Doc.  #61)  on  December  22,  2014,  and  plaintiffs  filed  a
Surreply (Doc. #64) on January 7, 2015.  For the reasons set forth
below, the motion is granted.

### I.

        On  March  28,  2014,  thirty-eight  of  Bernard  L.  Madoff's
(Madoff) former investors initiated this action against JPMorgan
Chase & Co., JPMorgan Chase Bank, N.A., J.P. Morgan Securities
LLC, J.P. Morgan Securities, Ltd. (collectively, "JPMC"), John
Hogan, and Richard Casa (collectively with JPMC, "defendants") to
recover  the  value  of  the  securities  listed  on  the  account
statements issued by Bernard L. Madoff Investment Securities LLC
on November 30, 2008.  Plaintiffs' Second Amended Complaint sets

forth the following ten claims arising out of defendants' alleged participation in the biggest Ponzi scheme in history: (1) violations of Section 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"); (2) violation of the Florida Securities and Investor Protection Act; (3) aiding and abetting embezzlement; (4) aiding and abetting breach of fiduciary duty; (5) unjust enrichment; (6) breach of fiduciary duty; (7) commercial bad faith; (8) gross negligence; (9) violation of the federal civil Racketeer Influenced and Corrupt Organizations Act (RICO); and (10) violation of the Florida Civil Remedies for Criminal Practices Act. (Doc. #52.) The underlying facts, as set forth in the Second Amended Complaint and the attached exhibits, are as follows:[1]

## A.   The Defendants

Defendant JPMorgan Chase & Co. (JPMorgan) is a federally-insured financial holding company incorporated under Delaware law

---

[1]Plaintiffs' allegations are based upon the following: (1) the January 6, 2014 Deferred Prosecution Agreement between the United States of America and JPMorgan Chase Bank, N.A. (Doc. #52-1, pp. 2-12); (2) the January 6, 2014 Criminal Information filed against JPMorgan Chase Bank, N.A. (Doc. #52-1, pp. 14-20); (3) the Statement of Facts incorporated into the Deferred Prosecution Agreement (Doc. #52-1, pp. 23-41); (4) the facts set forth in the Amended Complaint filed in Picard v. JPMorgan Chase & Co., Case No: 1:11-cv-913-CM (S.D.N.Y. Feb. 9, 2011); (5) the facts set forth in the Consolidated Amended Class Action Complaint filed in Shapiro v. JPMorgan Chase & Co., Case No: 1:11-cv-8331-CM (S.D.N.Y. Nov. 17, 2011); (6) plaintiffs' personal knowledge of their dealings with Madoff, Bernard L. Madoff Investment Securities LLC, and defendants; and (7) defendants' filings with the Securities and Exchange Commission. (Doc. #52, pp. 4-5.)

with its principal place of business in New York.  (Doc. #52, ¶ 14.)  JPMorgan operates six business segments: Investment Banking; Commercial Banking; Treasury and Security Services; Asset Management; Retail Financial Services; and Card Services.  (Id. ¶ 22.)  JPMorgan's activities are further divided among numerous divisions and groups that are located within or alongside these various business segments.  (Id.)  Plaintiffs allege that JPMorgan does not operate its various business segments, divisions, and groups within the confines of separate legal entities.  Rather, plaintiffs contend that JPMorgan "operates through many legal entities under the umbrella that is the financial holding company, JPMorgan Chase."  (Id.)

JPMorgan's principal banking subsidiary is defendant JPMorgan Chase Bank, N.A. (Chase).  (Id. ¶ 15.)  Chase is a national banking association organized under the laws of the United States with its principal place of business in Ohio.  Chase maintains offices in 23 states, including Florida.  (Id.)

Defendant J.P. Morgan Securities LLC (JPM Securities (US)) is the principal non-bank subsidiary of JPMorgan and is organized under the laws of Delaware.  (Id. ¶ 16.)  JPM Securities (US) is responsible for JPMorgan's investment banking in the United States.  JPM Securities (US) is registered with the SEC as a broker-dealer and investment adviser, and is a member of both the Securities Investor Protection Corporation (SIPC) and the

Financial Industry Regulatory Authority (FIRA).  (Id.)  Defendant
J.P. Morgan Securities, Ltd. (JPM Securities (UK)) is an indirect
subsidiary of JPMorgan and is organized under the laws of England.
(Id. ¶ 18.)  JPM Securities (UK) serves as JPMorgan's investment
banking arm in the United Kingdom, through which it conducts
security underwriting and engages in security dealings and
brokerage activities.  (Id.)

Defendant John Hogan (Hogan) began working for Chase
Manhattan Bank in 1999 as a capital markets credit officer.  (Id.
¶ 19.)  After Chase Manhattan Bank and JPMorgan merged in September
2000, Hogan became responsible for the credit portfolio group,
which managed the retained credit risk of Chase's Investment Bank.
(Id.)  In January 2012, Hogan was named the Chief Risk Officer for
all of JPMorgan and in June 2013, he became JPMorgan's Chairman of
Risk.  (Id.)

Defendant Richard Cassa (Cassa) was a Client Relationship
Manager in the Broker/Dealer Group at Chase.  (Id. ¶ 20.)  Cassa
was responsible for the accounts held by Madoff from approximately
1993 until his retirement in March 2008.  (Id.)

## B.   JPMC's Legal Obligations

Congress enacted the Currency and Foreign Transactions
Reporting Act of 1970, commonly known as the "Bank Secrecy Act,"
31 U.S.C. §§ 5311-5332, "in response to increasing use of banks
and other institutions as financial intermediaries by persons

engaged in criminal activity," Ratzlaf v. United States, 510 U.S. 135, 139 (1994).  The Bank Secrecy Act mandates that federally-insured financial institutions, such as JPMorgan, take certain steps to ensure compliance with the Bank Secrecy Act and to guard against money laundering.  31 U.S.C. § 5318(a)(2).

In order to guard against money laundering through financial institutions, the Bank Secrecy Act provides that financial institutions must establish and maintain effective anti-money laundering compliance programs.  31 U.S.C. § 5318(h)(1).  The compliance programs shall, at a minimum: (1) provide for a system of internal controls to assure ongoing compliance; (2) provide for independent testing for compliance to be conducted by national bank or savings association personnel or by an outside party; (3) designate an individual or individuals responsible for coordinating and monitoring day-to-day compliance; and (4) provide training for appropriate personnel.  31 U.S.C. § 5318(h)(1); 12 C.F.R. § 21.21(d).

The Bank Secrecy Act further provides that financial institutions are required "to report any suspicious transaction relevant to a possible violation of law or regulation."  31 U.S.C. § 5318(g)(1).  The regulations promulgated under the Bank Secrecy Act provide that a transaction is reportable if it is "conducted or attempted by, at, or through the bank, it involves or aggregates at least $5,000 in funds or other assets, and the bank knows,

suspects, or has reason to suspect that . . . [t]he transaction involves funds derived from illegal activities," or that the "transaction has no business or apparent lawful purpose or is not the sort in which the particular customer would normally be expected to engage, and the bank knows of no reasonable explanation for the transaction after examining the available facts, including the background and possible purpose of the transaction."  31 C.F.R. § 1020.320(a)(2).

A separate Bank Secrecy Act regulation provides that a bank must file a Suspicious Activity Report (SAR) when it detects any known or suspected federal criminal violation, or pattern of criminal violations, aggregating $5,000 or more in funds or other assets if the bank believes that it was used "to facilitate a criminal transaction, and the bank has a substantial basis for identifying a possible suspect or group of suspects."  12 C.F.R. § 21.11(c)(2).  If a transaction involves or aggregates $25,000 or more in funds or other assets, a bank must file a SAR whenever it "detects any known or suspected Federal criminal violation, or pattern of criminal violations," even if "there is no substantial basis for identifying a possible suspect or group of suspects."  12 C.F.R. § 21.11(c)(3).  Financial institutions satisfy their obligation to report such a transaction by filing a SAR with the Financial Crimes Enforcement Network (the "FinCEN"), a part of the

United States Department of Treasury.  12 C.F.R. § 21.11(c); 31 C.F.R. § 1020.320(a)(1).

At all relevant times, JPMC had designated an executive to serve as the head of its anti-money laundering program and as the individual ultimately responsible for ensuring JPMC's ongoing compliance with its Bank Security Act obligations, including the filing of SARs when required.  (Doc. #52-1, p. 24.)  As part of its anti-money laundering program, JPMC employed individuals in the United States and other countries that were responsible for filing SARs in the relevant jurisdiction.  (Id.)

**C.   The Business of BLMIS**

Bernard L. Madoff ran the largest known Ponzi scheme in history through Bernard L. Madoff Securities LLC and its predecessors and affiliates (collectively, "BLMIS").[2]  BLMIS had

---

[2]A "Ponzi scheme" is one "in which earlier investors' returns are generated by the influx of fresh capital from unwitting newcomers rather than through legitimate investment activity." MLSMK Inv. Co. v. JP Morgan Chase & Co., 651 F.3d 268, 269 (2d Cir. 2011) (quoting SEC v. Credit Bancorp., Ltd., 290 F.3d 80, 89 (2d Cir. 2002)).  For a description of the operations of the eponymous Charles Ponzi himself, see Cunningham v. Brown, 265 U.S. 1, 7-9 (1924).

three business units: (1) market making,[3] (2) proprietary trading[4] (collectively with market making, the "Trading Business"), and (3) investment advisory[5] (the "IA Business").  (Doc. #52, ¶ 46.)  The Trading Business was a legitimate business financed, in large part, by funds invested by customers of the IA Business.  (Id.)  The IA Business, on the other hand, was operated as a fraudulent scheme from at least the early 1990s.  The money received from customers of the IA business was used, in part, to make distributions to other customers and to purchase securities for the Trading Business.  (Id. ¶ 47.)  Of the approximately 200 employees employed by BLMIS in December 2008, 12 worked in the IA Business and the remainder worked in the Trading Business.  (Id. ¶ 48.)

As part of its Trading Business, BLMIS engaged in market-making and actively traded with various institutional counterparties, including Bear Sterns & Co. (Bear Stearns).  (Id.

---

[3]A market-maker is a dealer who, with respect to a particular security: (i) regularly publishes bona fide competitive bid and offer quotations in a recognized interdealer quotation system; or (ii) furnishes bona fide competitive bid and offer quotations on request; and (iii) is ready, willing, and able to effect transactions in reasonable quantities at its quoted price with other brokers or dealers.  (Doc. #52, ¶ 50.)

[4]"Proprietary trading" is "a trading strategy focused on using the institution's own money, rather than the money of its customers or investors, to make a profit for itself."  Latham & Watkins LLP, THE BOOK OF JARGON®: HEDGE FUNDS 64 (1st ed. 2013).

[5]An "investment adviser" is someone who provides financial advice or guidance to customers for compensation.  *Investment Adviser*, BLACK'S LAW DICTIONARY (10th ed. 2014).

¶ 50.)  Between 2000 and 2008, BLMIS's market-making business produced steady revenues of approximately $50 million a year. (Id. ¶ 51.)  The business had sufficient capital to support its trading activity and banked at the Bank of New York.  Madoff used the legitimate market-making trading volume to disguise the lack of trading conducted on behalf of the IA Business's clients. (Id.) Meetings were often held in view of the activity on the market-making trading floor in order to convince potential and established IA Business customers that its operations were legitimate and could support the steady returns that Madoff reported. (Id. ¶ 52.)

Madoff and BLMIS functioned as both an investment adviser to their customers and a custodian of their securities.  The precise date on which Madoff began offering investment advisory services is unknown, but it appears that Madoff was offering such services as early as the 1960s. (Id. ¶ 55.)  Over the course of years, Madoff and BLMIS were able to solicit approximately $17 billion in assets from IA Business customers.  Madoff initially told his customers that he would invest their funds pursuant to an arbitrage strategy.[6]  As time progressed, Madoff purportedly changed his investment strategy to the "split strike conversion" strategy (the

---

[6]An "arbitrage strategy" is used to take advantage of a price differential between two or more markets, such as buying an investment in one market and then immediately selling it at a higher price in another market.  Latham & Watkins LLP, THE BOOK OF JARGON®: HEDGE FUNDS 5 (1st ed. 2013).

"SSC Strategy"). (Id. ¶ 53.) Madoff represented to his customers that his strategy was to invest customer funds in a subset or "basket" of the common stocks that comprised the Standard & Poor's 100 Index (the "S&P 100"), a collection of the 100 largest publicly traded companies. Madoff claimed that the baskets of stock would mimic the movement of the S&P 100. He also asserted that he would carefully time purchases and sales to maximize value. Several times a year, customer funds would purportedly move "into the market," which consisted of allegedly purchasing a basket of stocks and corresponding option hedges. Customer funds were then moved "out of the market" and invested in United States Treasury Bills ("T-bills") or in mutual funds holding T-bills until the next trading opportunity arose. At the end of most quarters, the baskets were sold and the proceeds were invested in T-bills or other money market funds. (Id.)

As part of the SSC Strategy, Madoff also concocted a fictitious hedging strategy for the baskets of stock. As part of this strategy, Madoff purported to purchase and sell S&P 100 option contracts correlated to the stocks in the baskets, thereby limiting both the downside risk associated with possible adverse price changes in the baskets of stock and the profits associated with increases in the underlying stock prices. (Id. ¶ 54.)

Clients of the IA Business received monthly or quarterly statements identifying the securities that were held – or had been

traded through – their accounts, as well as the growth and profits generated by their accounts. (Id. ¶ 56.)  The trades reported on these statements, however, never actually occurred in the customers' names and were a complete fabrication.  Because no trades were actually executed, customer funds were never exposed to the uncertainties of price fluctuation, and account statements bore no relation to the United States securities market at any time.  As such, the only verifiable transactions were the customers' deposits into, and withdrawals out of, their particular accounts.

Ultimately, customer requests for payments exceeded the inflow of new investments, resulting in the Ponzi scheme's inevitable collapse.  (Id.)  The final customer statements issued by BLMIS in November 2008 falsely recorded nearly $64.8 billion of net investments and related fictitious gains.

**D.   JPMC's Banking Relationship with Madoff**

BLMIS maintained a continuous banking relationship with JPMC and its predecessor institutions, including Manufacturers Hanover Trust Company, Chemical Bank, and Chase Manhattan Bank, between 1986 and December 2008.  During that time, BLMIS held a series of linked direct deposit and custodial account at JPMC organized under the umbrella of a centralized "concentration account," number 140-

081703 (collectively, the "703 Account").[7]   (Doc. #52, ¶ 95; Doc. #52-1, p. 24.)   The 703 Account was the bank account that received and remitted, through a link of disbursement accounts, the overwhelming majority of funds that Madoff's victims "invested" with BLMIS.   (Doc. #52-1, p. 24.)   BLMIS also maintained linked accounts at JPMC through which Madoff held the funds obtained through his Ponzi scheme in, among other things, government securities and commercial paper.   (Id.)

Between approximately 1986 and December 2008, the 703 Account received deposits and transfers of approximately $150 billion, almost exclusively from BLMIS investors.   (Id.)   The 703 Account was not a securities settlement account and the funds deposited by Madoff's victims into the 703 Account were not used for the purchase and sale of stocks, corporate bonds, or options.   Nor were the funds deposited in the 703 Account transferred to other broker-dealers for the purchase or sale of securities.[8]   (Id. at 25.)

---

[7]A "concentration account" is a centralized deposit account used to aggregate funds from several locations into one centralized account.   Concentration accounts are generally used by institutions to process and settle internal bank transactions. *Concentration Account*, BLACK'S LAW DICTIONARY (10th ed. 2014).

[8]A "broker-dealer" is "[a] brokerage firm that engages in the business of trading securities for its own account (i.e., as a principal) before selling them to customers." *Broker-dealer*, BLACK'S LAW DICTIONARY (10th ed. 2014).

The balance in the 703 Account generally increased over time, peaking at approximately $5.6 billion in August 2008. Between August 2008 and December 11, 2008, billions were transferred from the 703 account to BLMIS customers, leaving a balance of approximately $234 million. (Id.)

At various time between the late 1990s and 2008, employees of various divisions of JPMC and its predecessor entities raised questions about BLMIS, including questions about the validity of BLMIS's investment returns. (Id.) At no time during this period did JPMC personnel communicate their concerns about BLMIS to the anti-money laundering personnel responsible for JPMC's banking relationship with BLMIS. Nor did JPMC file a SAR in the United States relating to BLMIS until after Madoff's arrest. (Id.)

### 1.   The Check Kiting Scheme

Beginning in the mid-1990s, employees in the Private Bank for Chemical Bank, a predecessor of JPMorgan, identified a series of transactions between the account of Norman Levy (Levy) and accounts held by BLMIS, including the 703 Account.[9]  The transactions between Levy and Madoff consisted of "round-trip" transactions which would typically begin with Madoff writing checks from an

---

[9]Levy was one of the bank's largest individual clients, with a portfolio valued (as of the mid-1990s) at approximately $2.3 billion.  Levy was highly valued by JPMC and its predecessors and was even provided with his own office at the JPMC Private Bank. (Doc. #52, ¶ 97.)

account at Bankers Trust Company ("BTC") to one of Levy's accounts at JPMC.  Later the same day, Madoff would transfer money from the 703 Account to his account at BTC to cover the check.  Levy would then transfer funds from his JPMC account to the 703 Account in an amount sufficient to cover the original check he had received from Madoff.  (Doc. #52, ¶¶ 100-106; Doc. #52-1, pp. 5-6.)  These round-trip transactions occurred on a daily basis for a period of years, and were each in the amount of tens of millions of dollars.  (Id.) Because of the delay between when the transactions were credited and when they were cleared (referred to as the "float"), the effect of these transactions was to make Madoff's balances at JPMC appear larger than they otherwise were, resulting in inflated interest payments to Madoff by JPMC.  (Id.)

In or about 1996, personnel from BTC investigated the round-trip transactions between Madoff and Levy.  As a result of the investigation, which included meetings with representatives of BLMIS, BTC concluded that there was no legitimate business purpose for these transactions, which appeared to be a "check kiting" scheme, and terminated its banking relationship with BLMIS.  (Id.) BTC notified JPMC that it had closed Madoff's bank account and filed a SAR identifying both BLMIS and Levy as being involved in suspicious transactions at BTC and JPMC for which there was no apparent business purpose.  (Doc. #52, ¶ 109; Doc. #52-1, p. 28.)

JPMC did not file a SAR relating to the round-trip transactions between BLMIS and Levy, terminate its banking relationship with Madoff, or direct the parties to cease such transactions. JPMC did, however, require Levy to reimburse JPMC for the interest payments that these transactions had cost the bank. JPMC allowed the round-trip transactions to continue until the end of 2002, at which time Hogan told Madoff that the practice "had to stop." (Doc. #52, ¶ 103.)

### 2.   The False FOCUS Reports

As a registered broker/dealer, BLMIS was required to file quarterly Financial and Operational Combined Uniform Single ("FOCUS") reports with the Securities Exchange Commission (SEC).[10] BLMIS's FOCUS reports often did not show assets and liabilities that should have been reported, including cash held in JPMC accounts, loans provided to BLMIS by JPMC, and related collateral on the loans JPMC extended to BLMIS. JPMC knew, or should have known, that BLMIS was not reporting this information to the SEC, but failed to take any corrective action against Madoff or BLMIS.

For example, BLMIS obtained a $95 million loan from Chase in November 2005 that was collateralized by a $100 million Federal Home Loan Bank Bond borrowed from Carl Shapiro (Shapiro). (Id. ¶¶

---

[10]FOCUS reports are basic financial and operational reports that set forth, among other things, the company's assets, liabilities, revenues, expenses, and loans. (Doc. #52, ¶ 115.)

117-118.)  The FOCUS report for that period, however, stated that
BLMIS did not have any outstanding bank loans or encumbered
securities.  JPMC received a copy of this FOCUS report and, based
on its own information, should have known that it was false.  (<u>Id.</u>)
Yet, JPMC did not disclose these inconsistencies to the SEC or law
enforcement authorities in violation of its duties under the Bank
Secrecy Act.

**E.  JPMC's Structured Products and Note Program**

In 2006, JPMC began considering various Madoff feeder funds
for the purpose of structuring and issuing its own financial
products so that it could make money based on the performance of
those funds.[11]  (Doc. #52, ¶ 212.)  The derivative products were
issued by JPMC's Equity Exotics Desk, a group that specialized in
creating complex derivatives based on the performance of certain
investment funds, in 2006 and 2007.  The purpose of the products
was to provide investors with "synthetic exposure" to hedge funds
or other equities without the investor making a direct investment
in the fund itself.  (Doc. #52-1, p. 30.)

The Madoff-derivative products offered by JPMC generally
worked as follows:

---

[11]A "feeder fund" is a hedge fund that feeds money into a
master-feeder fund, which in turn makes the investments on behalf
of the entire group of feeder funds.  Latham & Watkins LLP, THE
BOOK OF JARGON®: HEDGE FUNDS 31 (1st ed. 2013)

> JPMC issued notes for (which it sold through various
> distributors) and promised to pay note-holders a return
> that corresponded to the return of a particular Madoff
> feeder fund.  In order to hedge the risk created by those
> notes, JPMC then invested the Bank's own capital in the
> feeder fund directly.  JPMC's investment of its own money
> in the Madoff feeder funds as a hedge position would
> therefore in large part offset the risk associated with
> JPMC's obligation under the notes.   In this business
> model, JPMC's Investment Bank profited from transaction
> fees associated with issuing the notes, and endeavored
> to minimize risk resulting from these issuances.  Due to
> the features of the JPMC-issued notes, however, it was
> impossible for JPMC to eliminate all risks from its
> exposure to Madoff feeder funds.   For example, with
> respect to certain notes issued by JPMC that would pay
> the noteholder three times the Madoff feeder fund's
> investment returns, JPMC would suffer no losses if the
> Madoff feeder fund decreased in value by less than 33%,
> but could suffer substantial losses if the Madoff feeder
> fund's value fell to zero.

(Id.)  There was significant investor demand for the JPMC notes tied to the performance of the Madoff feeder funds, and by June 2007, JPMC's position in Madoff feeder funds had created approximately $105 million in risk exposure to BLMIS.  (Id. at 31.)

### 1.  Hogan Denies a Request to Increase JPMC's Risk Exposure to BLMIS by more than $1 Billion

In June 2007, traders on the Equity Exotics Desk planned to issue approximately $1 billion in Madoff-derivative products.  In order to carry out the plan, JPMC would have to invest more than $1.32 billion of its own capital in the Madoff feeder funds as a hedge, which would increase JPMC's risk exposure to $1.14 billion if the value of the feeder funds fell to zero.  (Doc. #52, ¶ 238;

Doc. #52-1, p. 31.)   Because of the size of the proposed risk exposure, Hogan informed the Equity Exotics Desk that the proposal would have to be presented to JPMC's Hedge Fund Underwriting Committee on June 15, 2007.  (Id.)

In advance of the meeting with the Hedge Fund Underwriting Committee, JPMC was able to conduct due diligence on some of the Madoff feeder funds, but not on BLMIS.  The presentation material submitted at the June 15, 2007 committee meeting indicated that Cassa and members of JPMC's Risk Management Division spoke to Madoff by telephone on March 30, 2007.  During this call, Madoff provided what JPMC employees considered to be forthcoming answers to questions posed about Madoff's purported investment strategy, but indicated that he did not approve of the Madoff-linked derivative products and made clear that he would not allow JPMC to conduct due diligence on BLMIS.  (Doc. #52, ¶¶ 226-227; Doc. #52-1, p. 32.)

The June 15, 2007 committee meeting ended without Hogan's approval of the proposed risk exposure.   While the reported consensus of the Hedge Fund Underwriting Committee was that "the fraud risk at Madoff is remote," Hogan concluded that no approval would be granted unless JPMC could do "direct due diligence on [BLMIS]."  (Doc. #52-1, p. 32.)  Hogan later stated in an email that "we don't do $1 [billion] trust me deals."  (Id.)

Shortly after the committee meeting ended, Hogan had lunch with Matt Zanes, a JPMC executive.  During the lunch, Hogan sent an email to a number of his colleagues, including the head of the Equity Exotics Desk, stating: "For whatever its worth, I am sitting at lunch with Matt Zanes who just told me that there is a well-known cloud over the head of Madoff and that his returns are speculated to be part of a Ponzi scheme – he said if we Google the guy we can see the articles for ourselves – Pls do that and let us know what you find."  (Doc. #52, ¶ 241.)  Jane Buyers-Russo, the head of JPMC's Broker/Dealer Group and a recipient of Hogan's email, asked one of her colleagues to "please have one of the juniors look into this rumor about Madoff that Hogan refers to below."  (Id. ¶ 243.)  The junior employee, however, was unable to locate the article to which Zanes had referred.[12]  (Id.)

On June 27, 2007, the head of JPMC's Investment Bank's structured products group emailed Hogan a "quick reminder" that JPMC had "client trades requiring $150 mm of delta to buy in funds

---

[12]The article referenced by Zanes was a 2001 Barron's feature entitled "Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even asks his investors to keep mum."  (Doc. #52-1, p. 33.)  The article noted that BLMIS had "produced compound average annual returns of 15% for more than a decade," and that "some of the larger, billion-dollar Madoff-run funds have never had a down year."  The article then reported that "some on the Street have begun speculating that Madoff's market-making operation subsidizes and smooths his hedge-fund returns" and describes how such smoothing could be accomplished through an unlawful practice knowns as front-running.  (Id.)

investing in Madoff on Friday of this week" and that there would be "further significant flows at next month end." (Doc. #52-1, p. 33.) Hogan then requested and received additional information from the Broker/Dealer Group about BLMIS, including information from its credit review. Hogan also asked Madoff about the business of BLMIS during a phone call on June 27, 2007. (Id.) Later that same day, Hogan approved up to $250 million in risk exposure to BLMIS. (Id.)

### 2. The Equity Exotics Desk Monitors JPMC's Exposure to BLMIS

In August 2007, Andrea De Zordo (De Zordo), an Equity Exotics Desk employee, conducted an analysis in order to determine the relationship between returns reported by a Madoff feeder funds and the investments in S&P 500 stocks and Treasury bills that Madoff claimed comprised his investment strategy. (Doc. #52, ¶ 247; Doc. #52-1, p. 34.) De Zordo was unable to determine based on available information how the Madoff feeder fund could have produced the reported returns had Madoff followed his purported investment strategy. Indeed, De Zordo stated that the market performance during the period analyzed was "far away" from the returns that Madoff "allegedly made." (Doc. #52-1, p. 34.) Despite these concerns, JPMC remained committed to its position in the Madoff feeder funds. (Doc. #52, ¶ 249.)

Following the collapse of Lehman Brothers Holdings on September 15, 2008, JPMC's Head of Global Equities directed Investment Bank personnel to substantially reduce JPMC's exposure to hedge funds, which had increased following JPMC's acquisition of Bear Stearns in March 2008. (Id. ¶ 256.) In order to determine which hedge funds to reduce exposure to, the Equity Exotics Desk asked its due diligence analyst, Scott Palmer (Palmer), to scrutinize JPMC's investments in various hedge funds, including the Madoff feeder funds. (Id.) Palmer conducted this due diligence by, among other things, analyzing the reported strategy and returns of BLMIS, speaking to personnel at Madoff feeder funds and financial institutions administering Madoff feeder funds, and unsuccessfully seeking from the feeder funds and administrators documentary proof of the assets of BLMIS. (Doc. #52, ¶¶ 257-163; Doc. #52-1, p. 35.)

On October 16, 2008, Palmer wrote a lengthy email to the head of the Equity Exotics Desk and others summarizing his conclusions (the "October 16 Memo"). The October 16 Memo described the inability of JPMC or the feeder funds to validate Madoff's trading activity or custody of assets. (Doc. #52-1, p. 35.) Palmer noted that the feeder funds were audited by major accounting firms, but questioned Madoff's "odd choice" of a small, unknown accounting firm. (Id.) The October 16 Memo reported that personnel from one of the feeder funds "said they were reassured by the claim that

22

FINRA and the SEC performed occasional audits of Madoff," but that
they "appear not to have seen any evidence of the reviews or
findings."   (Id.)   The October 16 Memo also questioned the
reliability of the information provided by the feeder funds and
the willingness of the feeder funds to obtain verifying information
from Madoff.  For example, the memo reported that personnel at one
feeder fund "seem[ed] very defensive and almost scared of Madoff.
They seem unwilling to ask him any difficult questions and seem to
be considering his 'interests' before those of the investors.  It's
almost a cult he seems to have fostered."  (Id.)  Palmer further
wrote that there was both a "lack of transparency" into BLMIS and
"a resistance on the part of Madoff to provide meaningful
disclosure."  (Id.)

The October 16 Memo ended with the observation that "[t]here
are various elements in the story that could make us nervous,"
including the fund managers' "apparent fear of Madoff, where no
one dares to ask any serious questions as long as the performance
is good."  (Id.)  In conclusion, Palmer stated that "I could go on
but we seem to be relying on Madoff's integrity (or the [feeder
funds'] belief in that integrity) and the quality of the due
diligence work (initial and ongoing) done by the custodians . . .
to ensure that the assets actually exist and are properly
custodied.  If some[thing] were to happen with the funds, our

recourse would be to the custodians and whether they have been negligent or grossly negligent." (Id.)

### 3. JPMC Files a SAR with the United Kingdom's Serious Organised Crime Agency

The October 16 Memo was forwarded to JPMC's in-house and external counsel, as well as the head of JPMC's anti-money laundering program for Europe, the Middle East, and Africa, who also served as JPMC's designated BSA Officer for the region (the "EMEA BSA Officer"). (Id.) After reviewing the October 16 Memo, the EMEA BSA Officer filed a SAR with the United Kingdom's Serious Organised Crime Agency (SOCA) and identified BLMIS as its "main subject – suspect." (Id.) Under "reason for suspicion," the EMEA BSA Officer wrote, in pertinent part:

> JPMCB's concerns around [BLMIS] are based (1) on the investment performance achieved by its funds which is so consistently and significantly ahead of its peers year-on-year, even in the prevailing market conditions, as to appear too good to be true – meaning that it probably is; and (2) the lack of transparency around [BLMIS] trading techniques, the implementation of its investment strategy, and the identity of its [over the counter] options counterparties; and (3) its unwillingness to provide helpful information. As a result, JPMCB has sent out redemption notices in respect of one fund, and is preparing similar notices for two more funds.

(Doc. #52, ¶ 279.)

In addition to reporting JPMC's suspicion that BLMIS was claiming returns that were "too good to be true," the SAR also identified a distributor of Madoff-linked derivatives as a "secondary subject" of the report. (Doc. #52-1, p. 36.) The basis

for JPMC's suspicions about the distributor was a call between a JPMC Investment Bank salesperson and an employee of the distributor in which JPMC informed the distributor that JPMC intended to invoke a provision of the note agreement enabling JPMC to delink the notes from the performance of a Madoff feeder fund. (Id.) During the call, the distributor's employee expressed displeasure about JPMC's proposed action and referenced having "Colombian friends who cause havoc . . . when they get angry." (Id.)

Prior to filing the SAR, a compliance officer and a JPMC lawyer based in the United Kingdom spoke to the Global Head of Equities about the Madoff redemptions and the need to potentially file a report. (Id. at 37.) The Global Head of Equities stated that Madoff was not an important client relationship to him. The Global Head of Equities also indicated that he supported taking any necessary steps with regard to "disclosure to US/UK regulators," and that he assumed JPMC's general counsel would be involved in the "ultimate decision." (Id.) No disclosure was made to United States regulators and no report was made to JPMC's general counsel. (Id.)

### 4.   JPMC Redeems its Positions in the Madoff Feeder Funds

On October 16, 2008, an Equity Exotics Desk employee requested by email a "list of all external trades and the counterparty trade" for each of the Madoff-related feeder funds, noting that "[t]he list needs to be exhaustive as we may terminating all of these

trades and we cannot afford to miss any." (Id.)  The Equity Exotics Desk, which had already placed redemption orders for approximately $78 million from the Madoff feeder funds between October 1 and October 15, thereafter sought to redeem almost all of its remaining money in the Madoff feeder funds. (Id.)

In addition to redeeming its positions in the Madoff feeder funds, JPMC sought, with the assistance of legal counsel, to cancel or otherwise unwind certain of the structured products related to the performance of the Madoff feeder funds. (Id.)  In an attempt to unwind these transactions, JPMC told the distributors of the Madoff notes that it was invoking a provision of the derivatives contracts that enabled it to de-link the notes from the performance of the Madoff feeder funds if JPMC could not obtain satisfactory information about its investments. (Id.)  For example, in a letter dated October 27, 2008, JPMC warned that it would declare a "Lock-In Event" under the terms of the contract unless the recipient – a distributor that Palmer had spoken to as part of his due diligence – could provide the identity of all of BLMIS's options counterparties by 5:00 PM the following day. (Id.)

In the fall of 2008, JPMC's position in the Madoff feeder funds fell from approximately $369 million at the beginning of October 2008 to approximately $81 million on December 11, 2008, a reduction of approximately $288 million, or approximately 80% of JPMC's proprietary capital invested as a hedge in Madoff feeder

funds.  (Id.)  During the same period, JPMC spent approximately
$19 million buying back Madoff-linked notes and approximately $55
million to unwind a swap transaction with a Madoff feeder fund
that eliminated JMPC's contractual obligation with respect to
those structured products.  When Madoff was arrested on December
11, 2008, JPMC booked a loss of approximately $40 million,
substantially less than the approximately $250 million it would
have lost but for these transactions.  (Id.)

No one at JPMC's Investment Bank involved in the redemptions
from the Madoff feeder funds informed anyone in the Broker/Dealer
Group of their concerns about the validity of Madoff's returns or
even the fact of the redemptions.  (Id. at 38.)  The key Investment
Bank personnel involved in the Madoff feeder fund redemptions knew
that the Broker/Dealer Group had a banking relationship with BLMIS.
(Id.)

## F.   Madoff's Arrest and the Ensuing Litigation

On December 11, 2008, Madoff was arrested by federal agents
and charged with securities fraud in violation of 15 U.S.C. §§
78j(b) and 77ff, and 17 C.F.R. § 240.10b-5, in the United States
District Court for the Southern District of New York.[13]  That same

---

[13]Madoff pled guilty to an 11-count criminal indictment on
March 12, 2009, and admitted that he operated a Ponzi scheme
through BLMIS's IA Business.  On June 29, 2009, Madoff was
sentenced to 150 years in prison.

day, the SEC filed a civil complaint alleging that Madoff and BLMIS were operating a Ponzi scheme through BLMIS's IA Business. On December 15, 2008, the SIPC filed an application in the civil action seeking a decree that the customers of BLMIS were in need of the protections afforded by the Securities Investor Protection Act of 1970 (SIPA).[14] The United States District Court for the Southern District of New York granted the SIPC's application and appointed Irving H. Picard (the "Trustee") as trustee for the liquidation of BLMIS. See Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC), 424 B.R. 122, 126 (Bankr. S.D.N.Y. 2010).

In order to satisfy the customer claims against BLMIS, the Trustee concluded that each customer's "net equity" should be calculated by the "Net Investment Method," crediting the amount of cash deposited by the customer into his or her BLMIS account, less any amount withdrawn from it. Id. "The use of the Net Investment Method limits the class of customers who have allowable claims

---

[14]SIPA establishes procedures for liquidating failed broker-dealers and provides their customers with special protections. In a SIPA liquidation, a fund of "customer property," is established for priority distribution exclusively among the failed broker-dealer's customers. In re Bernard L. Madoff Inv. Sec. LLC, 654 F.3d 229, 233 (2d Cir. 2011). Each customer shares ratably in the customer property fund to the extent of the customer's "net equity." Id. (citing 15 U.S.C. § 18fff-2(c)(1)(B)). Customers who wish to recover their net equity must file a claim with the SIPA trustee. Id.

against the customer property fund to those customers who deposited more cash into their investment accounts than they withdrew, because only those customers have positive 'net equity' under that method." Id.  Thus, the Trustee announced in January 2009, that he would not recognize any claims under the SIPA for what he called "fictitious profits." (Doc. #52, ¶ 31.)  The Trustee referred to the BLMIS customers who had a positive net investment, exclusive of appreciation, as "net losers." (Id.)  The BLMIS customers who had a negative net investment, exclusive of appreciation, were referred to as "net winners." (Id.)  Of the 4,900 customer accounts at BLMIS, approximately 2,300 were net losers and approximately 2,600 were net winners. (Id.)

On March 8, 2010, the Bankruptcy Court for the Southern District of New York issued a Memorandum Decision upholding the Trustee's use of the Net Investment Method on the ground that the last customer statements could not "be relied upon to determine [n]et [e]quity" because customers' account statements were "entirely fictitious" and did "not reflect actual securities positions that could be liquidated." In re Bernard L. Madoff Inv. Sec. LLC, 424 B.R. at 135.  The bankruptcy court's decision was affirmed by the Second Circuit on August 16, 2011, which held that it would have been legal error for the Trustee to "discharge claims upon the false premise that customers' securities positions are

what the account statements purport them to be." *In re* Bernard L.
Madoff Inv. Sec. LLC, 654 F.3d at 241.

On December 2, 2010, the Trustee filed a complaint against
JPMC in the Southern District of New York asserting both bankruptcy
and common law claims. (Doc. #52, ¶ 34.) On November 1, 2011,
the court dismissed the common law claims on the ground that the
Trustee was *in pari delicto* with Madoff and, thus, lacked standing
to bring those claims. See Picard v. JPMorgan Chase & Co., 460
B.R. 84 (S.D.N.Y 2011). The Second Circuit affirmed the dismissal
of the common law claims on June 20, 2013. Picard v. JPMorgan
Chase & Co. (*In re* Bernard L. Madoff Inv. Sec. LLC), 721 F.3d 54
(2d Cir. 2013).

After the district court dismissed the Trustee's common law
claims, Stephen and Leyla Hill and Paul Shapiro filed two class
action complaints against JPMC in the Southern District of New
York. These complaints asserted various claims against JPMC on
behalf of BLMIS customers who directly had capital invested with
BLMIS as of December 2008, *i.e.*, BLMIS customers who were net
losers. (Doc. #52, ¶ 35.) The two cases were consolidated on
December 5, 2011, and the plaintiffs filed a Consolidated Amended
Class Action Complaint (the "Class Complaint") against JPMC on
January 20, 2012. The Class Complaint set forth nine common law
claims against JPMC arising out of its relationship with Madoff.
(Doc. #58-2.)

Facing possible criminal and civil liability, JPMC and its adversaries entered into a global resolution on January 6, 2014, involving three simultaneous but separately negotiated settlements.  See Shapiro v. JPMorgan Chase & Co., Case No. 1:11-cv-8331-CM, 2014 WL 1224666, at *1 (S.D.N.Y. Mar. 24, 2014). First, JPMC entered into a Deferred Prosecution Agreement with the United States Attorney for the Southern District of New York, in which JPMC consented to the filing of a two-count Information charging it with the failure to maintain an effective money laundering program and the failure to file a SAR in October 2008. (Doc. #52-1, p. 2.)  As part of the agreement, JPMC agreed to forfeit $1.7 billion to the United States. (Id. at 3.)  JPMC also agreed to "accept and acknowledge responsibility for its conduct" as described in the Information and the 85 stipulated facts included in a Statement of Facts attached to the Deferred Prosecution Agreement. (Id. at 5.)  JPMC, having truthfully admitted the facts in the Statement of Facts, further agreed that "it shall not, through its attorneys, agents, or employees, make any statement, in litigation or otherwise, contradicting the Statement of Facts or its representations in this Agreement." (Id. at 7.)

Second, JPMC agreed to pay the Trustee $325 million in settlement of the Trustee's bankruptcy claims against JPMC. Shapiro, 2014 WL 1224666, at *1.

Third, JPMC agreed to pay $218 million in settlement of the Consolidated Class Action. _Shapiro_, 2014 WL 1224666, at *1.  For purposes of the settlement, the Court certified the Consolidated Class Action as a class action on behalf of all BLMIS customers who directly had capital invested with BLMIS as of December 11, 2008.  The class definition was intended to include only net losers.  _Id._ at *13.  As net winners, plaintiffs in this matter were excluded from the settlement, prompting the initiation of this action.  _Id._ at *9.

## II.

Under Federal Rule of Civil Procedure 8(a)(2), a Complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2). This obligation "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  _Bell Atl. Corp. v. Twombly_, 550 U.S. 544, 555 (2007) (citation omitted).  To survive dismissal, the factual allegations must be "plausible" and "must be enough to raise a right to relief above the speculative level."  Id. at 555.  _See also_ _Edwards v. Prime Inc._, 602 F.3d 1276, 1291 (11th Cir. 2010).  This requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  _Ashcroft v. Iqbal_, 556 U.S. 662, 678 (2009) (citations omitted).

In deciding a Rule 12(b)(6) motion to dismiss, the Court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff, Erickson v. Pardus, 551 U.S. 89 (2007), but "[l]egal conclusions without adequate factual support are entitled to no assumption of truth," Mamani v. Berzain, 654 F.3d 1148, 1153 (11th Cir. 2011) (citations omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678. "Factual allegations that are merely consistent with a defendant's liability fall short of being facially plausible." Chaparro v. Carnival Corp., 693 F.3d 1333, 1337 (11th Cir. 2012) (internal quotation marks and citations omitted). Thus, the Court engages in a two-step approach: "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Iqbal, 556 U.S. at 679.

### III.

In Count One of the Second Amended Complaint, plaintiffs allege that defendants are liable under § 20(a) of the Exchange Act because they controlled Madoff and BLMIS. Section 20(a) provides:

> Every person who directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such

> controlled person is liable, unless the controlling
> person acted in good faith and did not directly or
> indirectly induce the act or acts constituting the
> violation or cause of action.

15 U.S.C. § 78t(a).  This statute "imposes derivative liability on

persons that control primary violators of the Act." Laperriere v.

Vesta Ins. Grp., Inc., 526 F.3d 715, 721 (11th Cir. 2008) (per

curiam).  In order to state a claim under § 20(a), plaintiffs must

allege that (1) Madoff and BLMIS committed a primary violation of

the Exchange Act; (2) defendants had the power to control the

general business affairs of Madoff and BLMIS; and (3) that

defendants "had the requisite power to directly or indirectly

control or influence the specific corporate policy which resulted

in primary liability." Mizzaro v. Home Depot, Inc., 544 F.3d 1230,

1237 (11th Cir. 2008) (quoting Theoharous v. Fong, 256 F.3d 1219,

1227 (11th Cir. 2001)).

    With respect to the primary violation, plaintiffs allege that

Madoff and BLMIS violated § 10(b) of the Exchange Act and Rule

10b-5 promulgated thereunder.  In order state a claim for

securities fraud under these provisions, a plaintiff must

adequately allege:  (1) a material misrepresentation or omission;

(2) scienter-a wrongful state of mind; (3) a connection between

the misrepresentation and the purchase or sale of a security; (4)

reliance; (5) economic loss; and (6) a causal connection between

the material misrepresentation or omission and the loss, commonly

called "loss causation." Meyer v. Greene, 710 F.3d 1189, 1194 (11th Cir. 2013) (citing Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005).

## A.   Timeliness of Count One

Defendants first argue that plaintiffs' control person claim should be dismissed as untimely because plaintiffs waited more than five years to bring their § 20(a) claim.

A private action under § 20(a) of the Exchange Act must be filed within the earlier of "(1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation." 28 U.S.C. § 1658(b). See also 100079 Canada, Inc. v. Stiefel Labs., Inc., 596 F. App'x 744, 747-48 (11th Cir. 2014). Unlike the two-year statute of limitations which begins to run after the cause of action accrues, the five-year period begins to run at the time of the violation and is a statute of repose meant to serve as a cutoff for a cause of action. Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 363 (1991) (construing the statute under the previous one and three-year structure). See also Rogers v. Nacchio, 241 F. App'x 602, 605 (11th Cir. 2007).

As described in the Second Amended Complaint, the final violation of § 20(a) occurred on or before December 11, 2008, the date of Madoff's arrest and BLMIS's closure. (Doc. #55, ¶¶ 30, 341.) Thus, plaintiffs' right to bring a control person claim

under § 20(a) expired on December 11, 2013.  Plaintiffs, however, did not initiate this action until March 28, 2014, well after the five-year statute of repose had run.

Plaintiffs, relying on American Pipe & Construction Co. v. Utah, 414 U.S. 538 (1974), argue that their § 20(a) claim was timely filed because the pendency of the Consolidated Class Action tolled the statute of repose.  The Court disagrees.

## 1.   American Pipe

In American Pipe, the Supreme Court was asked to consider the relationship between a statute of limitations and the provisions of Fed. R. Civ. P. 23 regulating class actions in federal court. American Pipe, 414 U.S. at 54.  American Pipe was a federal antitrust suit brought by the State of Utah on behalf of itself and a class of other public bodies and agencies.  The suit was filed with only eleven days left to run on the applicable statute of limitations.  Id. at 541.  Eight days after the district court ruled that the suit could not proceed as a class action, a number of putative class members moved to intervene.  The district court denied the motions to intervene on the ground that the applicable limitations period had run.  Id.  The Court of Appeals for the Ninth Circuit reversed the district court's denial of the motions to intervene, concluding that the denial of class certification could not "strand" asserted members of the class for whom the statute of limitations had run while the case was pending.  Id. at

544-45.   The Supreme Court then affirmed the Ninth Circuit's decision, holding that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." Id. at 554.

In reaching this conclusion, the Supreme Court relied heavily on Fed. R. Civ. P. 23, reasoning that a contrary holding would "frustrate the principal function of a class action" and create a "multiplicity of activity which Rule 23 was designed to avoid." Id. at 551.   The court also relied on the equitable power of the courts to toll statutes of limitations.   Id. at 558.   Ultimately, the court stated that "the tolling rule we establish here is consistent both with the procedures of Rule 23 and with the proper function of the limitations statute."   Id. at 555.

The issue presented in this matter is whether American Pipe tolling applies to the statute of repose provision in 28 U.S.C. § 1658(b).   Because there are important differences between statutes of limitations and statutes of repose, the Court concludes that the statute of repose in not tolled.

### 2.   The Differences Between Statutes of Limitations and Statutes of Repose

The Supreme Court recently explained in CTS Corp. v. Waldberger, 134 S. Ct. 2175 (2014), that there are significant differences between statutes of limitations and statutes of

repose.  Id. at 2183.  A statute of limitations establishes a
deadline for commencing a civil action measured from the date the
claim accrues.  Id. at 2182 (citing BLACK'S LAW DICTIONARY 1546 (9th
ed. 2009)).  As a general matter, a claim "accrues" when the injury
occurred or was discovered.  Id.  "A statute of repose, on the
other hand, puts an outer limit on the right to bring a civil
action.  That limit is measured not from the date on which the
claim accrues but instead from the date of the last culpable act
or omission of the defendant."  Id.  The critical distinction
between the two statutes is that statute of limitations may be
tolled whereas statutes of repose may not, because the latter "is
a judgment that defendants should be free from liability after the
legislatively determined period of time, beyond which the
liability will no longer exist and will not be tolled for any
reason."  Id. at 2183 (citing 54 C.J.S. Limitations of Actions §
7, p. 24 (2010)).  See also Lampf, 501 U.S. at 363 (holding that
equitable tolling is inconsistent with the repose periods
applicable to federal securities claims).

### 3.  Application of American Pipe to the Statute of Repose

Federal courts disagree as to whether American Pipe's tolling
rule is equitable in nature, which would preclude its application
to a statute of repose, or statutory or "legal" in nature, which
would support its application to a statute of repose.  See Credit
Suisse Sec. (USA) LLC v. Simmonds, 132 S. Ct. 1414, 1419 n.6

(2012).  Plaintiffs, relying on Joseph v. Wiles, 223 F.3d 1155 (10th Cir. 2000), argue that American Pipe's tolling rule applies to statutes of repose because "American Pipe sets forth a principle derived from Fed. R. Civ. P. 23, whose purpose is to promote economy of litigation."  (Doc. #57, p. 13.)

In Joseph v. Wiles, the Tenth Circuit held that the tolling rule in American Pipe applied to the statute of repose in Section 13 of the Securities Act of 1933 because it was a rule of legal tolling derived from Fed. R. Civ. P. 23.  Joseph, 223 F.3d at 1166. In reaching this conclusion, the court noted that tolling the statute of repose while a class is awaiting certification serves Fed. R. Civ. P. 23's interest in judicial economy by eliminating the need for potential class members to file individual claims to secure their interests.  Id. at 1167.  The court furthered reasoned that defendants were not unfairly prejudiced by applying American Pipe tolling to the statute of repose since the previous class actions put them on notice of the substantive claims as well as the number and generic identities of the potential plaintiffs. Id. at 1168.

Defendants, on the other hand, urge the Court to follow the Second Circuit's holding in Police and Fire Retirement Systems of the City of Detroit v. IndyMac MBS, Inc., 721 F.3d 95 (2d. Cir. 2013).  (Doc. #55, p. 11.).  In IndyMac, the Second Circuit concluded that "American Pipe's tolling rule, whether grounded in

equitable authority or on Rule 23, does not extend to the statute

of repose in Section 13." IndyMac, 721 F.3d at 109.  In reaching

this conclusion, the court stated:

> Even assuming, *arguendo,* that the American Pipe tolling
> rule is "legal"—based upon Rule 23, which governs class
> actions—we nonetheless hold that its extension to the
> statute of repose in Section 13 would be barred by the
> Rules Enabling Act, 28 U.S.C. § 2072(b).  The Rules
> Enabling Act provides the Supreme Court "the power to
> prescribe general rules of practice and procedure," id.
> § 2072(a), including the Federal Rules of Civil
> Procedure, which "shall not abridge, enlarge or modify
> any substantive right," id. § 2072(b).  The use of the
> term "shall" in the statute's language indicates its
> mandatory nature; federal courts are bound by its
> dictates, including in the context of Rule 23.
> Accordingly, "the Rules Enabling Act forbids
> interpreting Rule 23 to 'abridge, enlarge or modify any
> substantive right,'" Wal-Mart Stores, Inc. v. Dukes, 131
> S. Ct. 2541, 2561 (2011) (quoting 28 U.S.C. § 2072(b)),
> and "underscores the need for caution[,] . . .
> counsel[ing] against adventurous application of" the
> Rule, Ortiz v. Fibreboard Corp., 527 U.S. 815, 845
> (1999).

IndyMac, 721 F.3d at 109.  Because a statute of repose creates a

substantive right, the court found that permitting a plaintiff to

file a complaint or intervene after the period of repose had run

would necessarily "enlarge or modify" a substantive right and

violate the Rules Enabling Act.  Id.

While the Court finds the Second Circuit's reasoning

persuasive, it need not adopt its rationale because the Supreme

Court and the Eleventh Circuit have both described the rule

established in American Pipe as "equitable tolling."  See Smith v.

Bayer Corp., 131 S. Ct. 2368, 2379 n.10 (2011) (noting that

40

American Pipe's holding is "specifically grounded in policies of judicial administration"); Young v. United States, 535 U.S. 43, 49 (2002) (citing American Pipe for the proposition that limitations periods are "customarily subject to equitable tolling"); Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 96 & n.3 (referencing American Pipe as a case in which the Supreme Court allowed "equitable tolling"); Raie v. Cheminova, Inc., 336 F.3d 1278, 1283 (11th Cir. 2003) (holding that the statute of limitations could not be halted by "equitable tolling under American Pipe"). See also Bridges v. Dep't of Md. State Police, 441 F.3d 197, 211 (4th Cir. 2006) (stating that the holding in American Pipe is an "equitable tolling rule"); Wade v. Danek Med., Inc., 182 F.3d 281, 289 (5th Cir. 1999) (same); Youngblood v. Dalzell, 925 F.2d 954, 959 n.3 (6th Cir. 1991) (same); Barryman-Turner v. District of Columbia, No. CV 14-00035 (RDM), 2015 WL 4509433, at *4 (D.D.C. July 24, 2015) (recognizing that the Fourth, Fifth, Seventh, and Eleventh Circuits have treated American Pipe as an equitable tolling doctrine). The Court therefore concludes that the holding in American Pipe is equitable in nature and does not extend to statute of repose provision in 28 U.S.C. § 1658(b).

It is clear from the face of the Second Amended Complaint that the five-year statute of repose expired on December 11, 2013, five years after Madoff's arrest and the closure of BLMIS. Plaintiffs, however, did not initiate this action until March 28,

2014.  Because American Pipe tolling does not apply to the statute of repose, the Court finds that Count One is untimely.  Count One is dismissed with prejudice.

## B.    Power to Control

Defendants also argue that plaintiffs' control person claim fails because JPMC did not "control" BLMIS or the Ponzi scheme as a matter of law.  (Doc. #55, p. 14.)

In order to establish derivative liability under § 20(a) of the Exchange Act, a plaintiff must allege that: (1) the controlled person committed a primary violation of the Exchange Act; (2) the defendant had the power to control the general affairs of the primary violator; and (3) the defendant "had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in primary liability." Mizzaro, 544 F.3d at 1237 (quoting Theoharous, 256 F.3d at 1227).  "The legislative purpose in enacting a control person liability provision was to prevent people and entities from using straw parties, subsidiaries, or other agents acting on their behalf to accomplish ends that would be forbidden directly by the securities laws." Laperriere, 526 F.3d at 721 (citations omitted).

Here, plaintiffs allege that defendants had complete control over Madoff and the IA Business because the banking services of a major financial institution, such as those provided by JPMC, were indispensable to Madoff's fraudulent scheme.  Because defendants

had the power to terminate their banking relationship with BLMIS at any time and the obligation to notify the federal banking authorities of Madoff's conduct, plaintiffs allege that Madoff had to obey any order he received from defendants. (Doc. #52, ¶¶ 336-346.)  The Court finds that these allegations are insufficient to show that defendants had the power to control the general affairs of BLMIS, or that they had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the primary violation.  See Paracor Fin., Inc. v. GE Capital Corp., 96 F.3d 1151, 1162-63 (9th Cir. 1996) (noting that courts have been very reluctant to treat banks and other services providers as controlling persons); Schlifke v. Seafirst Corp., 866 F.2d 935, 948-50 (7th Cir. 1989); Metge v. Baehler, 762 F.2d 621, 631 (8th Cir. 1985), cert. denied, 474 U.S. 1057 (1986). Indeed, plaintiffs' allegations regarding Madoff's refusal to allow JPMC to conduct due diligence on his operations plainly contradict any claim that JPMC controlled Madoff and BLMIS.  See Boilermakers Nat'l Annuity Trust Fund v. WaMu Mortg. Pass Through Certificates, Series AR1, 748 F. Supp. 2d 1246, 1260 (W.D. Wash. 2010).

Furthermore, there are no plausible allegations as to why defendants would knowingly involve themselves in Madoff's inevitably doomed Ponzi scheme in order to earn routine banking fees.  See Schmidt v. Fleet Bank, Case No. 96 Civ. 5030(AGS), 1998

WL 47827, at *6 (S.D.N.Y. Feb. 4, 1998) ("Ponzi schemes are doomed to collapse . . . and while an individual may be able to escape with the proceeds of a Ponzi scheme, a bank cannot.   Thus, participation in the scheme would not appear to be in the banks' economic interest."); Kalnit v. Eichler, 264 F.3d 131, 140-41 (2d Cir. 2001) (when "plaintiff's view of the facts defies economic reason," it "does not yield a reasonable inference of fraudulent intent").

The Second Amended Complaint is void of any facts plausibly suggesting that defendants had the power to control the day-to-day affairs of BLMIS or the power to directly or indirectly control or influence the specific corporate policy behind Madoff's Ponzi scheme.   Therefore, the Court also concludes that plaintiffs have not sufficiently alleged that defendants were "control persons" for purposes of § 20(a) of the Exchange Act.   See In re JDN Realty Corp. Sec. Litig., 182 F. Supp. 2d 1230, 1249 (N.D. Ga. 2002).

**C.   Actual Damages**

Finally, defendants assert that Count One should be dismissed because plaintiffs, as parties who profited from Madoff's Ponzi scheme, have not suffered actual damages and cannot sue to recover fake profits that they never earned.   The Court agrees.

Section 28(a) of the Exchange Act limits recovery in any private damages action brought under the Exchange Act to "actual damages."   15 U.S.C. § 78bb(a); Blue Chip Stamps v. Manor Drug

Stores, 421 U.S. 723, 734 (1975).  The appropriate measure of actual damages in a Rule 10b-5 case is generally calculated using the out-of-pocket rule.  Pelletier v. Stuart-James Co., Inc., 863 F.2d 1550, 1557 (11th Cir. 1989).  Under this rule, a plaintiff may recover "the difference between the fair value of all that the [plaintiff] received and the fair value of what he would have received had there been no fraudulent conduct."  Randall v. Loftsgaarden, 478 U.S. 647, 661-62 (1986) (quoting Affiliated Ute Citizens v. United States, 406 U.S. 128, 155 (1972)).  See also Robbins v. Koger Props., Inc., 116 F.3d 1441, 1447 n.5 (11th Cir. 1997).  "The principle underpinning the out-of-pocket rule is that a plaintiff's injury is not the loss of what he might have gained if the false facts had been true, but rather what he has actually lost by being deceived into the purchase."  Barr v. Matria Healthcare, Inc., 324 F. Supp. 2d 1369, 1376 (N.D. Ga. 2004) (citing Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1437 n.2 (9th Cir. 1987)).  Thus, "[t]he measure of damages in a Rule 10b-5 case is limited to actual pecuniary loss suffered by the defrauded party, and does not include any speculative loss of profits."  Pelletier, 863 F.2d at 1557-58 (citing Wolf v. Frank, 477 F.2d 467, 478-79 (5th Cir. 1973)).

Plaintiffs in this matter allege that they are all net winners, meaning that they withdrew funds from BLMIS in an amount that exceeded their initial investments and subsequent deposits.

(Doc. #52, ¶ 38.)   In other words, plaintiffs received a full return on their principal as well as some "profit," which, in reality, consisted of other customers' investments.   Plaintiffs also recovered the taxes they paid on the fictitious profits generated by the Ponzi scheme.  (Id. ¶ 32.)  It is therefore clear from the allegations in the Second Amended Complaint that plaintiffs have not suffered an actual pecuniary loss under the out-of-pocket rule.   See Pelletier, 863 F.2d at 1558 n.17.

In certain limited circumstances, a court may award "benefit of the bargain" damages instead of out-of-pocket losses. Pelletier, 863 F.2d at 1558.  "Labeled expectation damages in the contract arena, this method of recovery seeks to put an injured plaintiff in the position he would have been in had his expectancy ensued.   It is marked by the difference between the security's actual value and what the defendant represented its value to be at the time of the sale."  Panos v. Island Gem Enters., 880 F. Supp. 169, 176 (S.D.N.Y. 1995).

In order to recover benefit of the bargain damages, plaintiffs must show that (1) there is an enforceable contract for the purchase or sale of securities, (2) the damages can measured with reasonable certainty, and (3) the damages are traceable to the defendants' fraud.  Id. at 177.  Benefit of the bargain damages are only available when the loss is based on a strict contractual expectation, not expert speculation.  Id. at 181.

The Court finds that plaintiffs are not entitled to benefit of the bargain damages in this case because they have failed to allege that there was a bargain or contract for the purchase of the securities listed on the fictitious account statements issued by BLMIS on November 30, 2008. See Pelletier, 863 F.2d at 1558; Sudo Props, Inc. v. Terrebonne Parish Consol. Gov't, Civil Action No. 04-2559, 2008 WL 2623000, at *7 (E.D. La. July 2, 2008). Furthermore, plaintiffs cannot lose something that never existed. Because the account statements are entirely fictitious and do not reflect actual security positions that could be liquidated (Doc. #52, ¶ 56), plaintiffs did not suffer any loss with respect to the imaginary profits listed on their account statements. If plaintiffs were able to recover the securities shown on their fictitious account statements, it would effectively legitimize Madoff's fraudulent scheme. Such a result would be inconsistent with the measure of damages set forth in Section 28(a) of the Exchange Act. See Panos, 880 F. Supp. at 176. See also Horowitz v. Am. Int'l Grp., Inc., No. 09 Civ. 7312(PAC), 2010 WL 3825737, at *7 (S.D.N.Y. Sept. 30, 2010) (noting that "[i]t would be simply absurd to credit the fraud and legitimize the phantom world created by Madoff").

Accordingly, the Court finds that plaintiffs have failed to plausibly allege that they suffered actual damages.[15]   Plaintiffs have therefore failed to plausibly allege a violation of § 10(b) of the Exchange Act and Rule 10b-5.   See Pelletier, 86 F.2d at 1558 (holding that "[t]he failure to show actual damages is a fatal defect in an anti-fraud action pursuant to Rule 10b-5").   See also Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 177-78 (3d Cir. 2001).   Because a primary violation of the securities law constitutes an essential element of a § 20(a) derivative claim, plaintiffs have failed adequately plead a control-person claim under § 20(a) of the Exchange Act.

In conclusion, the Court finds that defendants' motion to dismiss Count One is due to be granted.   Count One is dismissed with prejudice.

**IV.**

In Count Nine, plaintiffs allege that defendants violated 18 U.S.C. § 1962(c) "by knowingly participating in Madoff's

---

[15]Plaintiffs argue that they are entitled to the securities listed on their account statements pursuant to Article 8 of the Uniform Commercial Code.  This argument, however, is without merit. See Jacobson Family Invs., Inc. v. National Union Fire Insurance Co. of Pittsburgh, PA, 955 N.Y.S.2d 338, 345 (N.Y. App. Div. 2012) (holding that "any protectable UCC 'interest' based on the fictitious value of securities only existed for as long as the Madoff scheme remained hidden").

racketeering enterprise."[16]  (Doc. #52, ¶ 424.)  Defendants assert that this claim should be dismissed because it is precluded by the Private Securities Litigation Reform Act (PSLRA).  The Court agrees.

Section 107 of PSLRA, enacted as an amendment to the civil RICO statute, provides that "no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962." 18 U.S.C. § 1964(c).  Courts have applied the RICO bar in § 1964(c) broadly, regardless of whether the plaintiff explicitly relied upon securities fraud as a predicate act or even had standing to pursue a securities fraud claim.  Licht v. Watson, 567 F. App'x 689, 693 (11th Cir. 2014).  A plaintiff cannot avoid the RICO bar by pleading other specified offenses, such as mail or wire fraud, as predicate acts in a civil RICO action if the conduct giving rise to those predicate offenses amounts to securities fraud.  Id. (citing Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc., 189 F.3d 321, 331 (3d Cir. 1999).  See also MLSMK Inv. Co. v. JP Morgan Chase & Co., 651 F.3d 268, 277 (2d Cir. 2011) (holding that the

---

[16]Section 1962(c) of the RICO Act makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).

PSLRA bar applies "even where a plaintiff cannot itself pursue a securities fraud action against the defendant"); Howard v. Am. Online, Inc., 208 F.3d 741, 740 (9th Cir. 2000) (holding that the RICO bar applies even where the plaintiff does not have standing to sue under securities laws because the plaintiff did not buy or sell securities).

Here, plaintiffs allege that Madoff committed mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 by sending customers "periodic trade confirmations reflecting trades in their accounts that, in fact, did not occur, and monthly account statements that stated falsely that the customers' money was invested in various securities and that BLMIS has transacted various stock and bond transactions on their behalves."  (Doc. #52, ¶ 419-421.)  This conduct is integrally related to the purchase and sale of securities.  See Bald Eagle Area Sch. Dist., 189 F.3d at 330 (concluding that "[a] Ponzi scheme . . . continues only so long as new investors can be lured into it so that the early investors can be paid a return on their 'investment.' Consequently, conduct undertaken to keep a securities fraud Ponzi scheme alive is conduct undertaken in connection with the purchase and sale of securities").  Accordingly, the Court finds that

plaintiffs' RICO claim is barred by Section 107 of the PSLRA.[17]

See <u>Licht</u>, 567 F. App'x at 693.  Count Nine is therefore dismissed.

**V.**

It is well established that a district court may decline to exercise supplemental jurisdiction over state law claims if the court "has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c).  As set forth above, plaintiffs' claims arising under federal law are dismissed. Accordingly, there is no independent basis for jurisdiction over plaintiffs' state law claims.  With that being the case, the Court declines to exercise supplemental jurisdiction over the remaining state law claims, which are dismissed without prejudice.[18]   See

---

[17]This is not the first case in which a plaintiff attempted to assert a RICO claim premised on JPMC's relationship with Madoff. In <u>MLSMK Investment Co. v. JP Morgan Chase & Co.</u>, 651 F.3d 268 (2d Cir. 2011), the plaintiff alleged that JPMC conspired to violate RICO by "knowingly and purposely conspiring with Madoff to further Madoff's racketeering enterprise by providing Madoff with banking services that were integral to the functioning of the racketeering enterprise and by engaging in various RICO predicate acts, including numerous interstate wire communications, for which the defendants were paid substantial fees . . . derived entirely from Madoff's racketeering enterprise." 651 F.3d at 272-73.  On appeal, the Second Circuit held, as the Court does in this matter, that the plaintiff's RICO claim was barred by Section 107 of the PSLRA because it was based on conduct that would have been actionable as securities fraud.  <u>Id.</u> at 280.

[18]As set forth in 28 U.S.C. § 1367(d), the period of limitations for plaintiffs' state law claims is tolled for a period of thirty days after this dismissal unless state law provides for a longer tolling period.

_Reddy v. Gilbert Medical Transcription Serv., Inc._, 588 F. App'x 902, 904 (11th Cir. 2014) ("Absent a viable federal claim . . . however, the district court should dismiss any state law claims.").

Accordingly, it is now

**ORDERED:**

1. Defendants' Motion to Dismiss the Second Amended Complaint (Doc. #55) is **GRANTED**. Counts One and Nine are **dismissed with prejudice** and the remaining counts are **dismissed without prejudice**.

2. The Clerk shall enter judgment accordingly, terminate all pending motions and deadlines as moot, and close the file.

**DONE AND ORDERED** at Fort Myers, Florida, this ___17th___ day of September, 2015.


_____
JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE


Copies:

Counsel of record